HEATHER E. WILLIAMS, #122664
Federal Defender
MATTHEW M. SCOBLE, #237432
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA  95814
Tel: 916-498-5700/Fax 916-498-5710
matthew.scoble@fd.org

Attorney for Defendant
JASON B. SCARCELLO

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Case No.  2:12-CR-00288 TLN |
| Plaintiff, | ) DEFENDANT'S SENTENCING |
| vs. | ) MEMORANDUM |
| | ) Date: September 10, 2015 |
| JASON B. SCARCELLO, | ) Time: 9:30 a.m. |
| Defendant. | ) Judge: Hon. Troy L. Nunley |

Comes now the Defendant, Jason Scarcello, asking that the Court sentence him to 60 months in custody.  Probation has calculated Mr. Scarcello's guideline range to be 188-235 months, based on an Offense Level of 36.  For the reasons set forth in the Defense Formal Objections [Docket No. 84], we believe this to be incorrect and urge the Court to find that the correct Offense level is 30, resulting in a guideline range of 97 to 121 months.  In accordance with the Plea Agreement [Docket No. 72], the government will ask the court to impose a sentence of 97 months.  For the reasons set forth below, a sentence of 60 months fully comports with the directives of 18 USC §3553(a).

**I.**

**History and Characteristics of Jason Scarcello**

a.   Physical Condition

Mr. Scarcello's serious medical problems began as a teenager when he was diagnosed

with "global headaches with throbbing occurring in a wavelike pattern, lasting for several days in a row, in conjunction with severe nausea" [PSR ¶59]. He was diagnosed with arterio-venus malformation [AVM] in 1998 [Id.]. These headaches continued until early adulthood, when Mr. Scarcello suffered a grand mal seizure so severe that he fractured his spine in two places [PSR ¶¶ 59, 61]. In 2001, Mr. Scarcello suffered another grand mal seizure, this one associated with bleeding and causing a temporal occipital subdural hematoma. This hematoma placed pressure on the brain causing visual disturbances, confusion, and disorientation [PSR ¶62]. Mr. Scarcello's seizures continued to increase, and he was admitted for "emergency treatment following multiple grand mal seizures" in 2011 [Id.]. In 2013, while in custody pending the charge in the instant case, he was again admitted to the emergency room following a loss of consciousness. His Dilantin level was toxic, and a CT scan showed decreased brain volume in area of the AVM [PSR ¶63].

Mr. Scarcello continues to suffer both petit and grand mal seizures. But these symptoms pale in comparison to the lethality presented by AVM. As set forth in the PSR, AVM "carries a 4% per year risk of bleeding, which can result in a disabling or fatal stroke" [PSR ¶60]. Mr. Scarcello will be 45 years old at the time of his sentencing, meaning that as he stands before the court, he will have a risk of a brain bleed somewhere between 80 and 87% [Id.]. Approximately half of such bleeds result in permanent disability or death [Id.].

    b. <u>Mental Condition</u>

Mr. Scarcello has suffered from debilitating anxiety since childhood [PSR ¶66]. Since 2011, he has suffered "frequent, debilitating panic attacks with longstanding major depression and struggled with feelings of hopelessness, helplessness, and suicidal ideation on a weekly basis" [Id.]. In her psychological evaluation, Dr. Natasha Khazanov characterizes Mr. Scarcello as having a "moderate degree of cognitive/neuropsychological impairment" [Id.]. Further, that "the longstanding presence of AVM, in conjunction with his seizure disorder and comorbid psychiatric complexities greatly influenced his cognitive, emotional behavioral, and sexual functioning…" [PSR ¶64]. This combination of deficits "significantly influenc[es] his daily

actions and functional capacity" [Id.].  Mr. Scarcello takes multiple medications to manage his psychiatric symptoms [PSR ¶66].

    c.  <u>Jason Scarcello is a cherished member of his family</u>

Letters from Mr. Scarcello's family detail how valued and important he is in their lives.  Mr. Scarcello's wife, Amanda, notes that he has "always been a loving and devoted husband and father" [Letter, dtd. Aug 3, 2015].  She has been in a position to know and observe Mr. Scarcello for the last 14 years of their marriage and is of the opinion that he "suffered from anxiety and depression", and that his criminal conduct was "due to his mental state" [Id.].  Though as his wife she has every reason to be angry and resentful toward him for his criminal conduct, her "greatest fear is that he will die in custody, never having the opportunity to be with his family and children again" [Id.].

Wendy Addy, Mr. Scarcello's sister, describes the awe she felt at seeing the love he showed his adopted children [Letter, dtd. Oct. 9, 2014].  She was especially moved by the patience demonstrated toward his autistic daughter [Id.].

Mr. Scarcello's aunt writes of his dedication to family, relating an anecdote in which he rushed to his grandparents' house to assist in clean-up after a plumbing mishap caused their house to flood [Letter, dtd June 9, 2014].  Given Mr. Scarcello's fragile physical state, pitching in to such heavy manual labor speaks volumes about Mr. Scarcello's selfless devotion to his family.

    d.  <u>Jason Scarcello presents a low risk of recidivism</u>

In the course of conducting her evaluation, Dr. Khazanov also considered the likelihood for Mr. Scarcello to reoffend.  She states "his level of sincere remorse and grief around his actions…his pro-social values and high-intelligence, make me comfortable stating with a reasonable degree of psychological certainty that Mr. Scarcello has profited from his painful experiences, and is unlikely to re-offend" [PSR ¶67].

//

//

## II.

## LAW AND ARGUMENT

### A. THE SENTENCING GUIDELINE FAILS TO PROVIDE AN ADEQUATE BENCHMARK FOR SENTENCING THIS TYPE OF CASE

In December 2012, as a response both to the sheer number of child pornography cases and the "steadily decreasing rate of sentences imposed within the applicable guidelines ranges," the Sentencing Commission released its long-awaited report reevaluating the applicable guideline. U.S. Sentencing Commission, Federal Child Pornography Offenses at Exec. Summary at ii (Dec. 2012) available at www.ussc.gov.  That report concludes that "as a result of recent changes in the computer and Internet technologies that typical non-production offenders use, *the existing sentencing scheme in non-production cases no longer adequately distinguishes among offenders based on their degrees of culpability.*" Id. (emphasis added).

This is because "four of the six sentencing enhancements in §2G2.2 – those relating to computer usage and the type and volume of images possessed by offenders, which together account for 13 offense levels – now apply to most offenders." Id., at iii.  Thus those so-called "enhancements" (which apply to virtually every case) "fail to differentiate among offenders in terms of their culpability." Id.  The Commission notes that the guideline is the product of "an earlier technological era . . . when the typical offender obtained child pornography in printed form in the mail." Id.  The Commission recognizes that most parties in the federal criminal justice system, including the Department of Justice, consider the guideline to be "seriously outmoded." Id.

Given that the current guideline is archaic, the Commission recommends changing it, because it "places a disproportionate emphasis on outdated measures of culpability regarding offenders' collecting behavior and insufficient emphases on offenders' community involvement and sexual dangerousness." Id. at xviii.  The Commission notes that its hands are tied, in many respects, because many of the current outmoded guideline provisions were promulgated pursuant to specific congressional directives or legislation and cannot be undone without authority.  Id.

Many of those outmoded provisions are applied in Mr. Scarcello's PSR and are discussed specifically below.

As with the crack cocaine guideline, which was criticized and rejected for years before Congressional action permitted the Sentencing Commission to fix it, this guideline cannot be relied on as an arbiter of a fair sentence that comports with 18 U.S.C. § 3553(a). In fact, given the Commission's rejection of many of the guideline provisions applicable in this case, reliance on the guideline guarantees that the resulting sentence will be far harsher than necessary to address the fundamental principles of federal sentencing.

It is clear that the Court may "vary [from the Guideline ranges] based solely on policy considerations, including disagreements with the Guidelines," Kimbrough v. United States, 128 S. Ct. 558, 570 (2007) (internal quotation marks omitted), and when it does, the courts of appeals may not "grant greater factfinding leeway to [the Commission] than to [the] district judge." Rita v. United States, 127 S. Ct. 2456, 2463 (2007). This would be especially true where, as here, the Commission has noted that the guideline does not adequately measure the seriousness of the offense or the offender.

Whether a judge may draw any useful advice from a guideline depends first on whether the Commission, in promulgating or amending it, acted in "the exercise of its characteristic institutional role." Kimbrough, 128 S. Ct. at 575. As described in Rita, the exercise of this role has two basic components: (1) reliance on empirical evidence of pre-guidelines sentencing practice, and (2) review and revision in light of judicial decisions, sentencing data, and comments from participants and experts in the field. Rita, 127 S. Ct. at 2464-65. Here, although the applicable Guideline was not promulgated based on the Commission's institutional role (since most of the increases were politically mandated, United States v. Henderson, 649 F.3d 955, 962 (9th Cir. 2011)), the Commission's recent 468-page, intensely detailed report repudiating the guideline is based on the Commission's characteristic empirical research, data analysis, and consideration of comments from stakeholders. Accordingly, the Report has much more relevance to this sentencing than the guideline should.

In considering a guideline not based on data, study, or past practice, it is not "fair to assume" that the guideline "reflect[s] a rough approximation" of sentences that "might achieve 3553(a) objectives." Rita, 127 S. Ct. at 2464-65.  In Henderson, 649 F.3d at 962-63, the Ninth Circuit anticipated the Sentencing Commission's recent analysis and held that section 2G2.2 is precisely the kind of guideline deserving little deference because it is "to a large extent, not the result of the Commission's 'exercise of its characteristic institutional role,' which requires that it base its determination on 'empirical data and national experience. . . .'"  This is even truer where the Commission's recent review reveals the flaws in a politically-manipulated guideline.

Henderson identifies different routes to a reasonable sentence below the correctly-calculated guideline range. The Court may find a case to be outside the heartland to which the Commission intends the guideline to apply. 649 F.3d at 959, citing Kimbrough v. United States, 552 U.S. 85, 109 (2007). Further, it may find that the range fails to properly reflect section 3553(a) considerations. Id. Finally, the guideline may be suspect because it has not been developed in an exercise of the Commission's institutional role anaad therefore does not deserve the deference it might otherwise be owed. Id. at 962. All of these reasons undermine a 212-month, or even 97 month, sentence in this case.

For most persons convicted of this crime, the five-year mandatory sentence is more than sufficient to punish, deter (both specifically and generally), and protect the public. Sentencing judges have reached that conclusion notwithstanding the extremely harsh guideline: in 2014, the *median* sentence for child pornography offenders who received downward departures was *72 months*[1], for those who received departures and variances *71 months*[2], and for those who received only variances *75 months*[3]. U.S.S.C., 2014 Sourcebook, Tables 31A, 31B & 31C. These median sentences are impressive considering that most of these offenders were facing 60 month mandatory minimums.

In 2010, the Commission surveyed district court judges and found "widespread

---

[1] This represents a median decrease of 40% from the guideline minimum.
[2] This represents a median decrease of 45% from the guideline minimum.
[3] This represents a median decrease of 40% from the guideline minimum.

dissatisfaction with the extreme length of the Guideline-recommended sentences for possession-only defendants." United States v. Apodaca, 641 F.3d 1077, 1083 (9th Cir. 2011); U.S.S.C., Results of Survey of United States District Judges, January 2010 through March 2010, available at http://www.ussc.gov/Judge_Survey/2010/JudgeSurvey_201006.pdf. The Commission has been trying to fix the guideline for years, but is hampered by the political process of revision. Henderson, 649 F.3d at 961-62 (reviewing history of guideline).

The Commission's 2011 Annual Report noted, "The offense type with the highest rate of non-government sponsored below range sentences was child pornography (44.9%)." U.S.S.C., 2011 Annual Report, p. 36. The Commission's Sourcebook of Sentencing Data shows that out of 1,855 child pornography cases sentenced between October 1, 2010 and September 30, 2011, only 647 cases were sentenced within the guideline range. See U.S.S.C., 2011 Sourcebook of Federal Sentencing Statistics, Table 27. This continued in the Fiscal Year ending in 2012, where only 705 out of 2,012 child pornography offenses were sentenced within the range. See U.S.S.C, 2012 Sourcebook of Federal Sentencing Statistics, Table 27. This trend remained the norm in the Fiscal Year ending 2014, in which 600 out of 1,924 child pornography offenses received guideline sentences. See U.S.S.C, 2014 Sourcebook of Federal Sentencing Statistics, Table 27. Thus, by the most recent measure, 69% per cent of child pornography offenders received sentences below the guideline range - raising, of course, the specter of sentencing disparity and an unreasonably harsh sentence for any offender sentenced within the guideline range.[4] See 18 U.S.C. § 3553(a)(6).

As discussed below, and confirmed by the Sentencing Commission, most of the upward adjustments recommended in Mr. Scarcello's case are the vestiges of an anachronistic guideline that does not accurately distinguish between various offenses and offenders or provide a reasonable recommendation to the Court.

---

[4] The high rate of below-guidelines sentencing has led Prof. Douglas Berman, a law professor and nationally-recognized expert on federal sentencing, to say that, "generally speaking, in a mine-run case a below-guideline sentence rather than a within-guideline sentence complies with the 3553(a)(6) statutory instruction to sentencing judges to avoid unwarranted disparities." D. Berman, "Interesting new federal sentencing data to mine from USSC," June 1, 2011 available at http://sentencing.typepad.com/sentencing_law_and_policy/.

### B. SPECIFIC GUIDELINE ADJUSTMENTS THAT ADD YEARS TO MR. SCARCELLO'S GUIDELINE RANGE HAVE BEEN REPUDIATED BY THE SENTENCING COMMISSION AND DO NOT RESULT IN A REASONABLE SENTENCING RECOMMENDATION UNDER 18 U.S.C. § 3553(a)

The guidelines in this case includes specific offense characteristics that do not separate the serious offenders from the less serious. According to the Sentencing Commission's publication *Use of Guidelines and Specific Offense Characteristics* report for Fiscal Year 2014, the number of images enhancement over 600 images applies in 78% of cases and the use of computer enhancement in 95% of cases. According to the report over 84% of cases involve the sadomasochistic image enhancement and 95% of the cases applied the under age 12 enhancement. *U.S.S.C., Use of Guideline and Specific Offense Characteristics for Fiscal Year 2014* at 41-42; Report at Table 8-1, p. 209 (FY 2013 data).

Mr. Scarcello's guideline range is driven by many adjustments that do not appropriately assess the sentencing factors the Court must consider under 18 U.S.C. § 3553(a). For example, the number of images, type of images and use of a computer result in a thirteen-level increase under the guidelines, yet are all applicable in the vast majority of cases and do not distinguish between various offenders or offenses.

The very determination of the base offense level is not tied to the severity of the offense: the guideline adds four levels because a defendant is convicted of "receipt" instead of "possession," but there is no rational difference between the two [PSR ¶27]. As noted in the Sentencing Commission's report, the technological developments "militate in favor of punishing receipt in an equivalent manner to possession rather than in an equivalent manner to distribution." Report, at xx. The Commission's review of over 2000 cases demonstrated that the underlying offense conviction for a possession offense was "indistinguishable from the offense conduct in the typical case in which an offender was prosecuted for receipt." Id. Accordingly, the Commission recommends that "Congress align the statutory penalties for receipt and possession." Id.

The Commission conducted a special analysis of 2010 cases and determined that the vast majority of offenders sentenced under § 2G2.2 (97.5%) actually "engaged in knowing receipt

and/or distribution conduct" although some of them were only convicted of simple possession. Report, at 146-47. The vast majority of possession offenders (95.3%) engaged in knowing receipt or distribution conduct and would have faced a five-year mandatory minimum sentence if they had no prior convictions. Id., at 147-48.

Although this Court cannot do away with the mandatory minimum sentence for a receipt conviction, it can certainly equalize the base offense levels for the two offenses by deleting four offense levels, from a 22 to an 18. The Commission's work indicates that there is no basis in law or fact to treat receipt and possession differently. Mr. Scarcello's sentence should not be subject to a 4-level increase, for a factor that has nothing to do with the severity of his offense.

Further, modern computers with their ability to easily transfer and store vast numbers of images without distinction regarding the content of those images -- also leads to a five-level increase for over 600 images [PSR ¶32] and an additional 2-level increase for the type of image [PSR ¶28].

This increase is on top of a 2-level increase simply for using a computer [PSR ¶31]. As District Judge Robin Cauthon of the Western District of Oklahoma testified to the Commission, "[W]idespread as computer use is now, enhancing for use of a computer is a little like penalizing for speeding, but increasing that if you're using a car." Report, Appendix C at C-9. The Sentencing Commission noted that the "use of a computer" adjustment was promulgated in 1996, when most offenders obtained illegal images in paper form. Report, at 6, 138-39. In 1996, using a computer to obtain illegal images indicated a more technologically sophisticated offender, but now, given pervasiveness of the Internet in modern life, the adjustment no longer indicates any increased seriousness of the offense.

As the Sentencing Commission recognizes, none of these guideline adjustments, which hugely raise the recommended sentence, rest on any real distinction in the "seriousness of the offense" under 18 U.S.C. § 3553(a).

### C. GIVEN MR. SCARCELLO'S BACKGROUND AND CIRCUMSTANCES HE SHOULD BE SENTENCED TO 60 MONTHS.

### i.  USSG GUIDELINES BASIS FOR DEPARTURES

Mr. Scarcello's case presents several bases for departures enumerated in the Sentencing Guidelines:

**(1) Defendant's Physical Health: AVM, Epilepsy**

Courts should and do take a defendant's health into account in assessing sentence term based wholly or in part on health considerations.  See, e.g., United States v. McFarlin, 535 F.3d 808, 811 (8th Cir. 2008);  United States v. Martin, 363 F.3d 25, 49-50 (1st Cir. 2004);  United States v. Gee, 226 F.3d 885, 902 (7th Cir. 2000).  The Guidelines policy statement §5H1.4 states that "an extraordinary physical impairment may be reason to depart downward."

As the PSR notes, Mr. Scarcello suffers from cerebral hemisphere arteriovenus malformation [AVM] and epilepsy [PSR ¶59].  The AVM has caused brain hemorrhages and seizures [PSR ¶¶59, 61, 62]. The AVM is lethal and Mr. Scarcello is at serious risk for a disabling or fatal stroke [PSR ¶60]. He has had multiple grand mal seizures, and has smaller seizures several times per month [PSR ¶63]. He requires anti-convulsant and psychotropic medications [PSR ¶64].

**(2) Defendant's Mental and Emotional Condition**

Mr. Scarcello's troubles do not end with physical problems.  As set forth in the PSR, Mr. Scarcello's "AVM, in conjunction with his seizure disorder and comorbid psychiatric complexities greatly influenced his cognitive, emotional, behavioral, and sexual functioning by disrupting neural circuitry within his brain" [PSR ¶64].  He suffers from "chronic, refractory depression and comorbid chronic anxiety with panic attacks" [PSR ¶66].  As a consequence, Dr. Khazanov concludes that "in deciding his personal culpability it is important to understand that Mr. Scarcello's ability to control his impulses and make decisions was profoundly impaired by the unfortunate combination of the physical damage to his brain, co-morbid mental illness, and multiple psychotropic medications…" [PSR ¶67].  Such a mental or emotional conditions are an appropriate basis for a departure. See, USSG §5H1.3.

Mr. Scarcello needs therapy and treatment to deal with his myriad mental health issues.

With treatment and therapy there is every reason to believe that Mr. Scarcello can live a law-abiding life.

     **ii.**    **18 USC §3353(a) FACTORS IN SUPPORT OF REQUESTED SENTENCE**:

A substantial variance is needed in this case because of the following mitigating factors, all of which are highly relevant to the purposes of sentencing and none of which is taken into account by the guidelines range. Counsel submits that given all of the factors in this case, a sentence of 60 months is reasonable, and sufficient to achieve the goals of sentencing as set forth in 18 U.S.C. §3553(a) as follows:

    **(1) Nature and Circumstances of Offense and History and Characteristics of Defendant**

Mr. Scarcello is 45 years old and has had no prior contacts with law enforcement. Apart from the instant case, he has led a blameless life. When confronted by law enforcement, he was immediately cooperative and ceased any illegal on-line activity. Although he possessed approximately 6,400 images and video files of child pornography, this is a fraction of what is commonly seen in cases of this sort. While the sentencing guidelines apply an unreasonable high enhancement for the number of images, the relatively small number that Mr. Scarcello possessed make this a mitigated case.

    **(2) The Need for the Sentence Imposed**

When law enforcement came to Mr. Scarcello's home, he made no attempt to flee or abscond. He was cooperative with the agents and provided a written statement [PSR ¶¶7, 8, 9, 11, 12]. Mr. Scarcello has been incarcerated since his arrest in July of 2012, and has had no misconduct in jail. He clearly is able to follow direction and conform his conduct to what is required of him.

      A) A sentence of 60 months reflects the seriousness of the offense and provides more than just punishment for the offense, particularly for someone in criminal history category I.

      B) A sentence of 60 months provides adequate deterrence, not only to Mr.

-11-   *U.S. v SCARCELLO*, 2:12-CR-00288 TLN
*Defendant's Sentencing Memorandum*

Scarcello who is acutely aware that he needs to find constructive ways to deal with his physical and mental issues, but to anyone who learns of such a sentence.  Such a sentence will ensure that Mr. Scarcello receives the treatment and counseling he needs, while recognizing that he poses a low risk of reoffending.

**(3) Kinds of sentence available**

The mandatory minimum sentence is 60 months.  Per the terms of the plea agreement, the government will recommend a sentence of 97 months.   The Court can impose up to a lifetime of supervision, ensuring that when released, Mr. Scarcello continues to receive any support that he needs to continue in a positive direction.

**(4) The advisory sentencing guidelines range**

The PSR calculates the guideline range to be 188-235 months.  For reasons set forth in the Defense Formal Objections, the defense objects to this calculation.  The stipulated guideline range set forth in the plea agreement is 97-121 months.

**(5) Pertinent policy statements of the sentencing guidelines**

Counsel is unaware of any relevant policy statements of the guidelines that should affect this case.

**(6) Unwarranted sentence disparities among defendants**

As the Court is well aware, the national trend in heartland child pornography cases is to impose significantly shorter sentences than those set forth in the advisory guidelines.  In our own District there are far fewer cases where judges have not varied from the guidelines, than those that have sentenced within guidelines.  In this case, a substantial variance is needed to avoid an unwarranted disparity among similarly situated defendants.

A sentence of 60 months is sufficient to punish the conduct of a man whose mind and body betrayed him years ago; a man for whom the odds are against surviving even a 60 month sentence. Mr. Scarcello is a thoughtful man who, heretofore, has no criminal record and has not spent a single day in jail. He has made terrible choices, choices that he will pay for for the rest of his life.  But these choices were rooted in a bottomless despair, a means to escape the intolerable

prisons that are his own body, and his own mind.  A sentence of 60 months is only the beginning of the lifetime Mr. Scarcello will spend bearing the ineradicable stigmas of convicted felon and registered sex offender.

Based on the aforementioned reasons, the defendant respectfully requests that the Court sentence him to 60 months in custody.

Dated:  September 2, 2015

        HEATHER E. WILLIAMS
        Federal Defender

        */s/ MATTHEW M. SCOBLE*
        MATTHEW M. SCOBLE
        Assistant Federal Defender
        Attorney for Defendant
        JASON B. SCARCELLO